UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| SATISH SHETHI and ELIZA SHETHI | ) | |
| | ) | No. 07 B 05886 |
| Debtors. | ) | |
| | ) | Honorable Susan Pierson Sonderby |

## MEMORANDUM OPINION

This matter is before the Court on the "Objections of Chapter 7 Trustee to Debtors' Claimed

Exemptions in Certain Insurance Policies and Request for Related Relief" (the "Objections").

**Background**.

Debtors filed their voluntary petition under chapter 7 of the Bankruptcy Code on April 2,

2007. Along with their petition, they filed, *inter alia*, their Schedules B and C, i.e., "Personal

Property" and "Property Claimed as Exempt," respectively. Schedule B calls, in item no. 9, for

disclosure of interests in insurance policies. Specifically, it states (under the column "Type of

Property"): "Interests in insurance policies. Name insurance company of each policy and itemize

surrender or refund value of each." Debtors listed the following in response to item no. 9:

| | | |
|---|---|---|
| New York Life (approximate value) | H | 110,000.00 |
| Equitable life (approximate value) | H | 112,000.00 |
| New York Mutual Life (approximate value) | H | 80,000.00 |
| Northwest Mutual Life | H | 50,000.00 |
| Equitable Life (approximate value) | W | 40,000.00 |
| Northwest Mutual (approximate value) | W | 25,000.00 |

The designation "H" or "W" indicates ownership by either husband or wife. The values were

listed in the column labeled "Current Value of Debtor's Interest in Property, without Deducting any

Secured Claim or Exemption." In Schedule C, Debtors claimed the foregoing "Interests in Insurance Policies" as exempt under 215 ILCS 5/238, listing each one with the same values listed above in both the column labeled "Value of Claimed Exemption" and the column labeled "Current Value of Property Without Deducting Exemption."

On July 2, 2007, Debtors filed an amended Schedule B, which did not in any respect change the listing, in item no. 9, of their interests in insurance policies. However, on July 16, 2007, Debtors filed a further amended Schedule B ("Second Amended Schedule B"), which revised Debtors' response to item no. 9 to read as follows:

| | | |
|---|---|---|
| AXA Equitable Life Insurance for insured Eliza M. Shethi, Policy No. 48229682 Beneficiaries: 50% to Satish Shethi and 50% to Son, Graeme R. Shethi. | W | 120,270.90 |
| AXA Equitable Life Insurance for owner and insured, Eliza M. Shethi, Policy No. 37238527, Beneficiaries: 25% to Grandson, Satish G.G. Shethi and 75% to Son, Graeme R. Shethi | W | 53,069.91 |
| Northwest Mutual Life for owner and insured, Satish Shethi, Policy No. 13-080-577. Beneficiary: Wife, Eliza Shethi. | H | 200,113.17 |
| AXA Equitable Life Insurance for owner and insured, Satish Shethi, Policy No. 37217988, Beneficiary: wife, Eliza M. Shethi. | H | 11,325.54 |
| AXA Equitable Life Insurance for owner and insured, Satish Shethi, Policy No. 37217988, Beneficiary: wife, Eliza M. Shethi. | H | 11,851.31 |

The policy number for the last policy listed above, which is the same as the policy number for the policy directly above it, appears to be incorrect. According to documents submitted by the trustee, the correct policy number appears to be 44236856.

-2-

On August 8, 2007, several weeks after the filing of Second Amended Schedule B, the trustee filed his objections to the Debtors' claimed exemptions in their insurance policies. In the Objections, the trustee - - by comparing Second Amended Schedule B to the prior version of Schedule B - - was able to ascertain that the Debtors had dropped from their schedules the New York Life, New York Mutual Life, and Northwest Mutual policies.

The remaining three policies, i.e., the two listed as "Equitable Life" and one listed as "Northwest Mutual Life," appear to remain on Second Amended Schedule B, but with different values (and with the "Equitable Life" policies now listed as "AXA Equitable Life"). Debtors also added two more "AXA Equitable Life" policies to Second Amended Schedule B, as listed above. Because Debtors did not contemporaneously amend their exemption schedule, it was not entirely clear which of the policies they claimed as exempt. Obviously, they would not be claiming any exemption in the New York Life, New York Mutual Life, and Northwest Mutual policies, which had been deleted from Schedule B. The trustee, in his Objections, assumed: (1) that the $50,000 exemption listed on Schedule C for a "Northwest Mutual Life" policy had reference to the Northwest Mutual Life policy shown on Second Amended Schedule B as Policy No. 13-080-577, with a value of $200,113.17; (2) that the $112,000 exemption listed on Schedule C for an "Equitable Life" policy had reference to the AXA Equitable Life policy shown on Second Amended Schedule B as Policy No. 48229682, with a value of $120,270.90; and (3) that the $40,000 exemption listed on Schedule C for an "Equitable Life" policy had reference to the AXA Equitable Life policy shown on Second Amended Schedule B as Policy No. 37238527, with a value of $53,069.91. (*See* Objections, at 4.) While these were reasonable assumptions, given the names of the insurers and the values involved, it was not entirely clear which of the Equitable policies were

being claimed as exempt, since there were now four Equitable policies (on Second Amended

Schedule B) rather than two (as shown on Schedule C).

The trustee was nonetheless able to formulate his Objections, which are based on five

separate grounds. First, he objects to all the exemptions because they lack the requisite specificity

called for under the Bankruptcy Code, Rules, and Official Forms; i.e., they fail to identify their

claimed exemptions in insurance policies by policy number or type of insurance.

In the trustee's second objection, he contends that 215 ILCS 5/238 excludes from protection

any policy loans, cash surrender, or other value payable to the insured. (Objections, at 6.) Section

5/238 provides as follows:

> § 238. Exemption.
> (a) All proceeds payable because of the death of the insured and the aggre-
> gate net cash value of any or all life and endowment policies and annuity
> contracts payable to a wife or husband of the insured, or to a child, parent
> or other person dependent upon the insured, whether the power to change
> the beneficiary is reserved to the insured or not, and whether the insured or
> his estate is a contingent beneficiary or not, shall be exempt from execution,
> attachment, garnishment or other process, for the debts or liabilities of the
> insured incurred subsequent to the effective date of this Code, except as to
> premiums paid in fraud of creditors within the period limited by law for the
> recovery thereof.

In essence, the trustee is contending that the phrase "payable to a wife or husband of the insured, or

to a child, parent or other person dependent upon the insured" modifies "aggregate net cash value,"

and not "life and endowment policies and annuity contracts."

Third, the trustee objects to the exemptions because § 5/238 protects insurance proceeds and

cash surrender and other value only as against the debts of the insured, and not from the

beneficiary's own creditors. Thus, under the three policies where one of the Debtors is the insured,

and the other is the beneficiary, the trustee would be entitled to all cash surrender and other value;

-4-

while the moneys are protected as against the *insured*/Debtor's obligations, they are not protected as to claims against the *beneficiary*/Debtor.

The trustee's fourth objection is premised on the language in § 5/238 that carves out an exception to the exemption for "premiums paid in fraud of creditors within the period limited by law for the recovery thereof." The trustee contends that the reach-back period in Illinois is five years and that fraud may be determined solely on the basis of insolvency. He states that the "presumed" premium payments made on the AXA Equitable policies for the applicable five-year period total $318,000 and that the annualized premium on the Northwestern Mutual policy is $14,141.04. He asserts that the premiums paid under these policies during the applicable period are recoverable from the cash surrender value.

Finally, the trustee asserts that the "Debtors' Policies are not exempt to the extent that they name a beneficiary or beneficiaries that are not among the enumerated beneficiary class in Section 5-238, such as any non-dependent children or grandchildren, or trusts." (Objections, at 14.) The trustee asserts this objection as to AXA Equitable policy no. 48229682 ("as to the fifty-percent (50%) beneficiary interest of the Debtors' son Graeme Shethi") and as to AXA Equitable policy no. 37238527 ("as to the seventy-five percent (75%) beneficiary interest of the Debtors' son Graeme Shethi, and the twenty-five percent (25%) interest of the Debtors' grandson"). The trustee notes that Debtors' son is at least 39 years old and therefore emancipated, and Debtors' grandson is a dependent, if at all, of Debtors' son. The trustee also asserts that two policies omitted from Debtors' schedules that are payable to an irrevocable trust would also come within this objection.

In the Objections, the trustee reserves his right to make further objections to exemptions claimed or to be claimed by the Debtors, as his investigation into Debtors' property interests is

ongoing.

The trustee noticed the Objections for hearing on September 12, 2007. At that hearing, Debtors requested leave to respond, and the court set a briefing schedule. On October 2, 2007, Debtors timely filed their Response to the Objections, as well as an Amended Schedule C. In their Response, Debtors state that they have filed an amended exemption schedule ("Amended Schedule C") in order to alleviate some of the trustee's objections. First, Debtors have omitted, in Amended Schedule C, AXA Equitable policy no. 37238527, "in concession to the Trustee's argument that Debtors' son, Graeme Shethi, and grandson, Satish G.G. Shethi, are not dependents, and ... therefore the policies naming them as beneficiaries [are] not subject to an exemption." (Response, at 3.) Second, they have added to their amended exemption schedule, with respect to the three policies claimed as exempt, all the detail previously provided in Second Amended Schedule B, filed on July 16, 2007. They have also changed the statute under which the exemptions are claimed; they now claim under 735 ILCS 5/12-1001(f), rather than 215 ILCS 5/238. Section 5/12-1001(f) provides as follows:

> § 12-1001. Personal property exempt. The following personal property, owned by the debtor, is exempt from judgment, attachment, or distress for rent:
> (f) All proceeds payable because of the death of the insured and the aggregate net cash value of any or all life insurance and endowment policies and annuity contracts payable to a wife or husband of the insured, or to a child, parent, or other person dependent upon the insured, whether the power to change the beneficiary is reserved to the insured or not and whether the insured or the insured's estate is a contingent beneficiary or not ...

This provision does not contain two of the limitations on the exemption codified at 215 ILCS 5/238--the statute relied upon by Debtors in their original Schedule C, filed with their petition ("Original Schedule C"). First, § 12-1001(f) does not limit its protection to the debts of the insured. Second,

-6-

there is no exception to the exemption of § 12-1001(f) for premiums paid in fraud of creditors.

Debtors, in amending their exemption schedule, did not increase the amount of life insurance claimed as exempt. Rather, in conformance with their Second Amended Schedule B, they deleted the entries for New York Life, New York Mutual Life, and Northwest Mutual, which had been valued in Original Schedule C at $110,000, $80,000, and $25,000, respectively. They retained the Northwest Mutual Life exemption of $50,000, even though they now listed the cash surrender value as $200,113.17. Finally, they retained the two Equitable Life exemptions, though now listing them as AXA Equitable Life and assigning specific policy numbers. Debtors thus claimed the following as exempt in their Amended Schedule C:

| (Description of Property) | (Value of Claimed Exemption) | (Current Value of Property Without Deducting Exemption) |
|---|---|---|
| Interests in Insurance Policies<br>AXA Equitable Life Insurance for insured Eliza M. Shethi, Policy No. 48229682, Beneficiaries:  50% to Satish Shethi and 50% to Son, Graeme R. Shethi. | 60,135.45 | 120,270.90 |
| Northwestern Mutual Life for owner and insured, Satish Shethi, Policy No. 13-080-577. Beneficiary:  wife, Eliza Shethi. | 50,000.00 | 200,113.17 |
| AXA Equitable Life Insurance for owner and insured, Satish Shethi, Policy No. 37217988, Beneficiary:  wife, Eliza M. Shethi. | 40,000.00 | 11,325.54 |

The trustee timely filed his reply in support of the Objections on October 17, 2007. In his reply, he contends that the objections to Debtors' *Original* Schedule C should be sustained, for essentially two reasons. First, Debtors "simply fail[ed in their response] to contest the Objections"

-7-

and therefore, in addition to expressly conceding the objection as to AXA Equitable Life policy no.

37238527 (where neither of the beneficiaries was dependent upon the insured), Debtors effectively

concede all the objections. Second, "[a]dditional failures by the Debtors in meeting their statutory

obligations under the Bankruptcy Code and Rules also compel sustaining the Objections." (Reply,

at 3.)   In this regard, the trustee notes that debtors have a duty to file accurate and complete

schedules and that the Debtors in this case repeatedly failed to fulfill these duties by, *inter alia*,

omitting specific property interests, policy numbers, the name of the insured, the beneficiary or

beneficiaries, and other information. According to the trustee, Debtors' "nonchalant and dismissive

attitude towards fulfilling their statutory obligations" and their "lack of honesty in repeatedly filing

contradictory, incorrect, and incomplete Original and Amended Schedules and their total lack of *full*

disclosure regarding their 'Interests in Insurance Policies' ... constitutes bad faith" sufficient to

warrant sustaining the Objections to Debtors' Original Schedule C.   (Reply, at 6-7; emphasis in

original).

The trustee next urges that for similar reasons, and because of the time and expense of

investigation necessitated by the Debtors' incomplete and incorrect disclosures, the doctrines of

equitable and/or judicial estoppel are applicable to "bar and strike Amended Schedule C" and to "bar

the Debtors from filing any amendment to their Original Schedule C, or to bar any such amendment

from having any effect." (Reply, at 8.)   He further contends that Amended Schedule C should be

denied any effect under the "Judicial Exception" to Bankruptcy Rule 1009(a)'s liberal amendment

policy, i.e., that the "'court may deny amendment of the schedule of exemptions upon a showing that

the debtor has acted in bad faith ... or if the amendment would prejudice creditors or third parties.'"

(Reply, at 11-12, quoting from *In re Icke*, 2006 Bankr. LEXIS 2820, at *6-*7 (Bankr. S.D.Ill. Oct.

4, 2006)).

Finally, the trustee asserts in his reply that even if Debtors' Amended Schedule C were not stricken, the exemptions claimed in that schedule would fail for the same reasons set forth in the trustee's Objections to their Original Schedule C, i.e., the five grounds discussed above. He also asserts that, to the extent any of the exemptions claimed in Debtors' Amended Schedule C are found to be valid, Debtors will be bound by the specific amounts set forth in that schedule.

After this matter was taken under advisement, the trustee filed a Supplement to his reply, which addresses only the trustee's "statutory language" arguments, as opposed to his estoppel and related contentions. (See Supplement, at 1-2.) However, only one of those statutory objections is actually discussed in the supplement, i.e., that there is no protection for cash surrender or other value payable to the insured, because in both § 5/238 and § 12-1001(f), the exemption extends only to "the aggregate net cash value of any or all life and endowment policies and annuity contracts payable to a wife or husband of the insured, or to a child, parent or other person dependent upon the insured." Again, the trustee is in essence contending that in both statutes, the phrase "payable to a wife or husband of the insured, or to a child, parent or other person dependent upon the insured" modifies the phrase "aggregate net cash value," and not "life and endowment policies and annuity contracts." Based on this interpretation, he asserts that two of the three policies claimed as exempt on Amended Schedule C fall without the statutes' protection. Since the cash surrender value is payable only to the owner, and the owner of two of the policies is the same as the insured, it is impossible for the cash value to be payable to a spouse or dependent of the insured.

**Discussion.**

-9-

The trustee, by first seeking in his reply the sustaining of his Objections to Debtors' *Original Schedule C*, puts the proverbial cart before the horse. The court must first determine whether there is a sufficient basis to "bar and strike Amended Schedule C" or to "bar [it] from having any effect." (Reply, at 8.) As noted above, Bankruptcy Rule 1009(a) sets forth a liberal amendment policy with respect to a debtor's schedules. It provides in relevant part:

(a) **GENERAL RIGHT TO AMEND.** A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed.

The Advisory Committee Note accompanying this rule states that it "continues the permissive approach adopted by former Bankruptcy Rule 110 to amendments of voluntary petitions and accompanying papers." In a case decided under former Rule 110, the Eleventh Circuit reversed the denial of an exemption claim in a tax refund. *In re Doan*, 672 F.2d 831 (11th Cir. 1982). In *Doan*, the debtors' "petition" stated that they expected a tax refund for 1979, but they did not list the refund on either their schedule of property or their schedule of exemptions. *Id.* at 832. When the trustee did not receive the refund from the IRS, he made inquiries and was advised by the debtors that they had received the refund directly. The debtors further advised that on advice of counsel, they had spent the money. *Id.* at 832.

When the debtors subsequently moved to amend their exemption schedule to include the refund, the bankruptcy court denied leave to amend and the district court affirmed. *Id.* In reversing that denial, the appellate court first noted a Third Circuit ruling that courts do not have discretion under Rule 110 to deny leave to amend or to require a showing of good cause. *Id.* at 833 (citing *In re Gershenbaum*, 598 F.2d 779, 781-82 (3d Cir. 1979)). The Court stated: "We agree with this holding, with the limited caveat that a court might deny leave to amend on a showing of a debtor's

-10-

bad faith or of prejudice to creditors." *Doan*, 672 F.2d at 833. The Eleventh Circuit then found that

with respect to the debtors' tax refund, there was no evidence of prejudice on the record. "Simple

delay in filing an amendment where, as here, the case is not closed does not alone prejudice

creditors." *Id.* Moreover, the mere fact that an amended exemption might be granted (thereby

removing property from the estate) does not give rise to prejudice. *Id.*

The Court further found no bad faith on the part of the debtors in amending their exemption

claim. Although agreeing with the bankruptcy court's premise that concealment should bar any

claim of an exemption in an asset that was concealed, the Eleventh Circuit found that the debtors

had not intentionally or fraudulently attempted to conceal their tax refund and that the bankruptcy

court's contrary conclusion was clearly erroneous. *Id.* The debtors had disclosed the existence of

the tax refund in their initial filing, and their attorney had discussed the refund with the trustee. The

debtors spent the money only on advice of their counsel, and they readily submitted to the trustee

the information that he requested about the refund. Although their failure to inform the trustee

immediately upon receiving the refund "should not serve as a model for a petitioner in bankruptcy

to follow," the Court held that it did not show intentional or fraudulent concealment or bad faith.

*Id.* at 833-34.

The permissive approach, allowing amendments to exemption claims in the absence of bad

faith or prejudice to creditors, has been adopted by many other courts, including the Seventh Circuit.

*See, e.g., In re Kaelin*, 308 F.3d 885, 889 (8th Cir. 2002); *In re Yonikus*, 996 F.2d 866 (7th Cir. 1993);

*Lucius v. McLemore*, 741 F.2d 125 (6th Cir. 1984); *In re Arnold*, 252 B.R. 778, 784 (9th Cir. BAP

2000). In *Yonikus*, the debtor sought to amend his schedules six years after his chapter 7 case was

filed to exempt a workers' compensation award that he had received but not disclosed to the trustee.

-11-

Indeed, at the time of the chapter 7 filing, the debtor did not disclose to his own bankruptcy attorney the personal injury lawsuit he had already filed--through different counsel--or the workers' compensation claim he had filed--through still another lawyer. *Id.* at 868. As a result, neither the personal injury lawsuit nor the workers' compensation claim was listed on the debtor's schedules of assets, and neither was claimed as exempt.

Some time after the entry of his discharge, the debtor received both the workers' compensation award and the settlement proceeds from the personal injury suit, and he failed to report them to the trustee. *Id.* The trustee ultimately learned of the personal injury action and filed an adversary proceeding to revoke the debtor's discharge based on his concealment of the personal injury suit. After presentation of evidence, the bankruptcy court revoked the debtor's discharge, finding that the personal injury settlement was property of the estate which the debtor had knowingly and fraudulently failed to report. That ruling was affirmed by the district court and then by the Seventh Circuit. *Id.*

After the revocation of his discharge, the debtor filed a supplemental schedule of exemptions, claiming the workers' compensation benefits. The trustee objected, and the bankruptcy court disallowed the exemption based upon the debtor's fraudulent concealment. The district court affirmed. On appeal, the Seventh Circuit first recognized that under Rule 1009(a), a schedule may be amended "as a matter of course" any time before the closing of the case. The Court then stated:

> There are exceptions to this principle. Exceptional circumstances may prevent a debtor from amending schedules. Amendment may be denied upon a showing of bad faith or prejudice to creditors or third parties. ... A mere allegation by an objector of bad faith is insufficient. Bad faith and/or prejudice must be shown by clear and convincing evidence. ... Agreeing with the position of other circuits regarding Bankruptcy Rule 1009(a), this circuit endorses the "permissive approach" of allowing amendment of schedules, including lists of exempt property, at any

time before the case is closed, with the caveat that an amendment may be denied upon a clear and convincing showing of bad faith by the debtor or prejudice to the creditors. ...

*Yonikus*, 996 F.2d at 872. The Court then noted that the issue of a debtor's intent is a question of fact--or of an inference that may be drawn from the facts--to be reviewed under the clearly erroneous standard. The bankruptcy court had found that the debtor's intent was fraudulent:[1] he did not list the personal injury or workers' compensation proceedings in his schedules; he did not claim them as exempt; he employed different law firms for each action and for the bankruptcy; he did not tell his bankruptcy lawyer about the personal injury, nor his personal injury lawyers about the bankruptcy; and he did not tell the trustee about the moneys he received. *Id.* at 872-73. The debtor's conduct showed that if the trustee had not himself discovered the personal injury and workers' compensation proceedings, they would have remained concealed. *Id.* at 873. The Seventh Circuit found no clear error in these findings; indeed, there was "clear evidence of intentional concealment and of bad faith." *Id.*[2]

In *In re Icke*, 2006 WL 2860809 (Bankr. S.D.Ill. 2006), a case which--like *Doan*--involved an objection to an amended exemption in a tax refund, the court noted that bad faith is determined by examining the totality of circumstances. *Id.* at *3 (citing, *inter alia*, *In re Kaelin*, 308 F.3d 885,

---

[1]    The court's findings were based on evidence that had been presented at the hearing on revocation of the debtor's discharge. The debtor contended that the court should have held a separate hearing on the exemption issues, but the Seventh Circuit disagreed. The Court explained that while Bankruptcy Rule 4003(c) permits a hearing on an objection to an exemption claim, it does not require one. The evidence presented in connection with the discharge revocation constituted sufficient evidence of intentional concealment of both the personal injury suit and the workers' compensation claim, and no further evidentiary hearing was necessary. *Id.* at 873-74.

[2]    In so holding, the Court rejected the debtor's contention that his nondisclosure--being based on a belief that assets which are clearly exempt need not be listed--was innocent. Not only was the law concerning the exemption of workers' compensation benefits far from clear, debtors have an absolute duty to report all property, whether exempt or not. *Id.* at 871-72.

889 (8th Cir. 2002)).  While a "concealment of assets is the usual ground for a finding of bad faith," a debtor's "intentional and deliberate delay in amending an exemption for the purpose of gaining an economic or tactical advantage at the expense of creditors and the estate" can also constitute bad faith.  *Id.*  The court suggested that some form of deception is required, and the trustee had presented no evidence of deception from which the court could infer the requisite intent on the part of the debtor.  *Id.*  The court then went on to discuss the alternate ground for denial of schedule amendments:

> The other judicially created ground for denying a debtor's amended claim of exemptions is a finding ... that the amendment prejudices creditors. ... A finding of prejudice may be made where a party, such as the trustee or a creditor, has detrimentally relied upon the debtor's initial schedules, for example, where a trustee has engaged in efforts to sell certain property which the trustee would not have attempted to sell if the debtor had initially claimed such property as exempt. ... Likewise, it has been held that if a distribution of assets has already been made on the basis of exemptions previously claimed, then it is unfairly prejudicial to creditors and too late to change exemptions. ... However, the fact that creditors will receive a lower distribution if a debtor's amended claim of exemptions is allowed, standing alone, does not constitute sufficient prejudice to deny a debtor the right to amend his or her schedules. ...

*Id.* at *4.  The court in *Icke* upheld the amendment, since there was nothing in the record[3] to indicate that allowing the amendment "would cause any greater prejudice to the Trustee or third parties than would normally be associated with any claim of exemption."  *Id.*

A leading treatise agrees that this is the correct approach:

> In determining whether the amendment would prejudice creditors, the appropriate inquiry is not whether a creditor will recover less or be adversely affected by the amendment.  Instead, a court must determine whether the creditor would

---

[3]        There was no evidentiary hearing in *Icke*; the parties chose to submit the matter on their papers and statements of counsel. *Id.* at *2.

be adversely affected by having detrimentally relied on the debtor's initial posi-
tion. Only when a creditor has changed its position in reliance on the original
statement, and would be adversely affected by amendment to that statement, may
it be said that the creditor will be prejudiced by permitting the amendment.

9 L. King, *Collier on Bankruptcy* ¶1009.02[1] (15th ed. rev. 2007).

A case that aptly illustrates prejudice to creditors for these purposes is *In re Talmo*, 185 B.R.
637 (Bankr. S.D.Fla. 1995), cited by the trustee in his reply. In *Talmo*, the debtor was a
sophisticated investor who owned approximately 300 acres of land in Florida. The debtor leased
the east 140 acres to various farmers (the "East 140 Parcel"). His home was located on the west 160
acres (the "West 160 Parcel"), and specifically, on a 30-acre sub-parcel thereof (the "30-Acre Sub-
Parcel"). At the time of the chapter 11 petition, Farm Credit of South Florida held a first mortgage
on all of the West 160 Parcel except for the 30-Acre Sub-Parcel on which the debtor's home was
built (and a small amount of unencumbered acreage) (the "118-Acre Sub-Parcel"). *Id.* at 639-40.
The FDIC, as receiver for First American Bank, held a mortgage on both the 118-Acre Sub-Parcel
and the East 140 Parcel. The FDIC mortgage was second in priority to the Farm Credit mortgage
on the 118-Acre Sub-Parcel and first in priority on the East 140 Parcel. The debtor filed his chapter
11 petition shortly before a scheduled foreclosure sale with respect to the FDIC mortgage. *Id.*[4]

In his original schedules, the debtor claimed only the 30-Acre Sub-Parcel as an exempt
homestead, even though he had been granted a homestead tax exemption by the Tax Assessor of
Palm Beach County, Florida for the entire West 160 Parcel. *Id.* The evidence at trial showed that
the debtor's decision not to include the 118-Acre Sub-Parcel in his original exemption claim was

---

[4]    There were other liens on the property as well, including, *inter alia*, a substantial judgment lien
encumbering both the 118-Acre Sub-Parcel and the East 140 Parcel.

-15-

carefully considered and calculated. Correspondence admitted into evidence revealed that the debtor had initially expressed concern to his counsel that unless he claimed the 118-Acre Sub-Parcel as exempt, there would be value available to his unsecured creditors. His counsel responded, *inter alia*, that claiming the 118-Acre Sub-Parcel as exempt would increase the risk that the FDIC would obtain a modification of stay to proceed with foreclosure or a dismissal based on bad faith in the filing of the chapter 11 petition. *Id*. at 640-41. The debtor accordingly decided not to claim the 118-Acre Sub-Parcel as exempt. At no time during the chapter 11 case did the FDIC (or for that matter, Farm Credit) seek stay relief as to the 118-Acre Sub-Parcel. Moreover, no party filed a motion to dismiss for bad faith. *Id*. at 641.

Approximately seven months after the petition, the FDIC and other creditors filed a motion to convert to chapter 7. Again, the debtor defeated this motion in part by representing that all non-exempt property, including the 118-Acre Sub-Parcel, would be dedicated to his reorganization plan. *Id*. at 641-42.

The debtor filed four plans during the chapter 11 case, three of which were submitted to creditors. None of the plans submitted to creditors received the votes necessary for confirmation. In each of the plans, the debtor treated only the 30-Acre Sub-Parcel as exempt; the 118-Acre Sub-Parcel was treated in each plan as non-exempt property available for funding payments to creditors. *Id*. at 642.

Eight months after the filing of the FDIC's unsuccessful motion to convert, the United States Trustee filed a motion to convert based on the debtor's inability to present a confirmable plan. That motion was granted, and a chapter 7 trustee was appointed the same day. *Id*. at 643. After approximately two months of marketing, the trustee received an offer to purchase the East 130

-16-

Parcel, and upon motion, he obtained an order approving the sale. All but a small portion of the net proceeds were paid to the FDIC. *Id.* At about this time, the debtor met with his attorneys, and they decided that the debtor would now amend his homestead exemption to include the 118-Acre Sub-Parcel. They all agreed, however, that the debtor should wait until after the sale of the East 140 Parcel before filing the amendment, "to ensure that the FDIC Mortgage would be satisfied from the proceeds of that sale" (thereby freeing up value on the 118-Acre Sub-Parcel for the debtor). *Id.* at 644. The amendment was filed shortly after the hearing on approval of the East 140 sale. *Id.*

Based on the foregoing facts as well as others affecting the issues of both bad faith and prejudice, the court sustained the trustee's objections to the amendment and struck it from the record.[5] With respect to prejudice, the court noted that all parties in interest were prejudiced by the failure to claim the expanded homestead at the outset, because it "changed the entire posture, development, timing, duration, and costs of the chapter 11 case." *Id.* at 645. If the amendment had been filed earlier, parties would likely have moved for stay modification or for dismissal based on bad faith. Moreover, the first motion to convert would more likely have been granted if the 118-Acre Sub-Parcel were not part of the proposed plans. *Id.* All these matters affected the duration and thereby the costs of the chapter 11 case and delayed distributions to creditors. *Id.* In addition, creditors would be prejudiced by the amendment because it would deprive them of the equity in the 118-Acre Sub-Parcel that was created when the FDIC was paid from proceeds of the East 140 sale. The court emphasized: "This is not simply a matter of the amended exemption decreasing the amount of property available for liquidation and distribution, but rather is a function of the manner

---

[5]        The court noted that although the Eleventh Circuit had held in *Doan* that "leave to amend" may be denied in these circumstances, "it may be more appropriate to refer to the relief as striking the amendment, since the debtor does not have to seek leave to amend under Fed.R.Bankr.P. 1009." *Talmo*, 185 B.R. at 645, n. 6.

in which the property *could* have been applied had the exemption been claimed earlier. *Id.* at 646 (emphasis added). The trustee might have, *inter alia*, explored ways of satisfying the FDIC mortgage first out of the 118-Acre Sub-Parcel, to free up more value for creditors from the non-exempt east parcel. And similar strategies might have been pursued by judgment lien creditors, who did not object to the East 140 sale, believing that their liens attached to the 118-Acre Sub-Parcel. *Id.* at 647.

Finally, the court held that the trustee had also established bad faith sufficient to disallow the amendment. The court noted that while prejudice focuses on the effect of the amendment on other parties, bad faith focuses on the debtor's motive. "[I]f the delay in amending his claimed exemption was deliberately intended to gain an economic or tactical advantage, at the expense of creditors and the interests of the estate, then the Court will find bad faith sufficient to disallow the [a]mendment." *Id.* at 648. The fact that the debtor had made a conscious decision not only to delay the amendment but to wait until after the court's approval of the East 130 sale--which would free up value for the debtor in the 118-Acre Sub-Parcel--clearly and convincingly demonstrated the debtor's bad faith. *Id.*[6]

In this case, the trustee contends that he has established both prejudice and bad faith. Borrowing the above-quoted language from *Talmo*, the trustee states that "Debtors' intentional and deliberate delay in filing their Amended Schedule C, for the purpose of gaining an economic or tactical advantage at the expense of creditors and the Estate regarding the Trustee's Objections,

---

[6]     The court found that the debtor's concealment of certain assets, including potential causes of action against third parties relating to a fungicide used on the 118-Acre Sub-Parcel, was also relevant to its decision to strike the amendment.

-18-

constitutes 'bad faith' ..." (Reply, at 11). Utterly unlike *Talmo*, however, nothing in the record[7] here

suggests that Debtors made a deliberate decision to delay the amendment in order to gain a tactical

advantage.

In support of his position, the trustee points, *inter alia*, to the fact that "Debtors twice

amended their Original Schedule B prior to the filing of the Trustee's Objections." He then goes

on to state:

> At the time the Objections were filed, the Debtors claimed exemptions in only
> some of the insurance interests listed on their Second Amended Schedule B
> pursuant to 215 ILCS 5/238. ... The Debtors *waited* until after the Trustee filed
> his Objections before they filed their Third Amended Schedule B and their First
> Amended Schedule C ... By their Amended Schedule C, the Debtors now claim
> exemptions pursuant to a different exemption statute ... in order to gain tactical
> advantage ...

(Reply, at 2.)

The trustee's innuendo here is misleading. First, with respect to the Debtors' insurance

interests, Third Amended Schedule B was identical to Second Amended Schedule B, which was

filed on July 16, 2007--more than three weeks prior to the filing of the trustee's Objections--and

which disclosed the policy numbers and the names of the issuers, insureds, and beneficiaries under

each policy, including the three now claimed as exempt. Inasmuch as Third Amended Schedule B

was identical to Second Amended Schedule B in this regard, there would be no reason to "wait" to

file it. Moreover, although Amended Schedule C was not filed until after the Objections, the

trustee's suggestion that Debtors consciously "waited" to file it under a different exemption statute

"in order to gain a tactical advantage" is not supported by the record. Again, Debtors had already

---

[7]    As in *Icke*, *supra* n. 3, the parties submitted this matter on their papers and statements of counsel.

disclosed, in their Second Amended Schedule B, considerable detail concerning their insurance policies. Notably, they did not increase, in Amended Schedule C, the value of life insurance claimed as exempt. Rather, in conformance with their Second Amended Schedule B--filed well before the Objections--they deleted the entries for New York Life, New York Mutual Life, and Northwest Mutual, which had been valued in the aggregate at $215,000 in Original Schedule C. They retained the two Equitable Life exemptions, though now listing them as "AXA Equitable Life" and assigning specific policy numbers.[8] And they retained the Northwest Mutual Life exemption of $50,000, even though they now listed the cash surrender value as $200,113.17. The fact that Debtors did not increase the claimed exemption amount further tends to negate any bad faith in the filing of Amended Schedule C.

In their Response, Debtors state that they filed the amended schedule in order to alleviate some of the trustee's objections. Not only did they add detail concerning each of the policies claimed as exempt--thereby vitiating the trustee's objection based on lack of specificity--they also omitted AXA Equitable policy no. 37238527, in concession to the trustee's objection that Debtors' son and grandson are not within the beneficiary class required to confer exempt status. (Response, at 3.) Debtors also changed the exemption statute under which they claimed from 215 ILCS 5/238 to 735 ILCS 12-1001(f). As indicated above, § 12-1001(f) does not limit its protection to the debts of the insured, and it also contains no exception for premiums paid in fraud of creditors. This change therefore had the effect of eliminating the grounds for the trustee's third and fourth

_____

8        As discussed *infra*, Debtors may have simply shifted the $40,000 exemption claim in AXA Equitable policy no. 37238527 to AXA Equitable policy no. 37217988 in their amended exemption schedule. In addition, while they appear to have increased the cash surrender value listed for AXA Equitable Policy no. 48229682 from $112,000 to $120,270.90, they have only claimed $60,135.45 as exempt (presumably in concession to the trustee's fifth objection, i.e., that one-half of this policy is not exempt because it names Debtors' non-dependent son as a beneficiary).

objections, thereby rendering exempt significant value which may otherwise have been payable to the estate. Again, however, the mere fact that Debtors delayed in claiming under the more liberal exemption statute does not by itself show bad faith. And while the trustee asserts that the delay was intentional and calculated, for the purpose of conferring on Debtors an economic or tactical advantage at the expense of creditors, he fails to point to any advantage other than the fact that the amended exemption will allow for greater value to the Debtors. Wholly unlike *Talmo*, Debtors did not deliberately defer the amendment in order to "pursue strategic goals" or to "preempt[] litigation strategies of creditors and the Trustee." *Talmo*, 185 B.R. at 648. The trustee has proffered no logical motive for the Debtors to have intentionally deferred their claim under the more liberal statute. Indeed, based on the record before the court, Debtors' initial choice of the more restrictive statute could as easily have been the result of ignorance of the more generous provision.

In addition to the trustee's assertions concerning the timing of the amendment, he also argues bad faith based on "false oaths" in the Debtors' schedules. Noting that "'honesty and full disclosure are the most basic hallmarks of good faith'" (Reply, at 6 (quoting from *In re Carter*, 205 B.R. 733, 736 (Bankr. E.D.Penn. 1996)), he makes very general allegations that "Debtors' lack of honesty in repeatedly filing contradictory, incorrect, and incomplete Original and Amended Schedules and their total lack of *full* disclosure regarding their 'Interests in Insurance Policies' ... constitutes bad faith ..." (Reply, at 6-7) (emphasis in original). He also alleges that "Debtors' Schedules have been amended so many times to correct falsities, *but only after their detection by third parties* ..." (Reply, at 1) (emphasis in original). The Debtors' "false oaths," urges the trustee, are "further demonstrated by their testimony in their Section 341 Meeting of Creditors," where they stated that they had had an opportunity to review the schedules for accuracy before signing them and that they understood

-21-

that they were obligated to list all of their assets. (Reply, at 1). According to the trustee, "the falsity of [Debtors'] oaths in the Original Schedules is not in doubt," given "the voluminous amendments that [they] made to their Original Schedules, in which ... they subsequently disclosed very substantial assets with significant value for the first time ..." (Reply, at 1.)

The trustee does not specify in his Reply which statements in the schedules constitute these "false oaths" or which "substantial assets" with "significant value" were disclosed in the amendments for the first time. Again, with respect to insurance policies, the Debtors do not appear to have added "substantial assets." Instead, they deleted "insurance interests" valued at $215,000.[9] While they appear to have added two AXA Equitable Life policies to Second Amended Schedule B, they only claim two of the four AXA Equitable policies as exempt--as in Original Schedule C-- and no new value has been added to the original exemption.[10]

The only "falsities" noted by the trustee with any specificity are those referenced in his Objections, in the section relating to premiums paid in fraud of creditors. There, the trustee points out that Debtors' original schedules listed a combined average monthly income of only $2,024, and their statement of affairs showed no income either from "employment or operation of business" (statement of affairs question no. 1) or "other than from employment or operation of business" (statement of affairs question no. 2). However, in the first amendment to their statement of financial

---

[9]     While the trustee appears to suggest that one or more of these policies may not even have existed (see Reply at 9), the record does not establish that the trustee's suggestion is correct or that the Debtors listed the policies with any fraudulent intent.

[10]     In Original Schedule C, the Debtors may have been claiming the $40,000 exemption in AXA Equitable policy no. 37238527, which appears (based on documents attached to the trustee's Objections) to have had a cash surrender value of approximately $53,000. If that is true, then they have in effect shifted that $40,000 exemption claim to cover instead the cash surrender value of AXA Equitable policy no. 37217988. The cash surrender value of policy no. 37217988, however, is far less than $40,000, and the shift between policies has little, if any, significance.

affairs, Debtors listed income from "employment or operation of business" as $16,875.03 for 2005,

$17,500 for 2006, and $7,500 for 2007 through the filing of the petition on April 2, 2007. They also

listed income "other than from employment or operation of business" as $197,204.53 for 2005 and

$229,141.34 for 2006.

The trustee also notes, *inter alia*, that Debtors stated, in answer to question no. 3(a) in each

of their original and amended statements of affairs, that they had not made payments aggregating

more than $600 to any one creditor during the ninety days preceding the petition.[11]  However,

information provided to the trustee by Debtors indicates that two of their AXA Equitable policies

required a monthly premium of $1,000, a third required a monthly premium of $2,200, and a fourth

required a quarterly premium of $3,300. According to information received by the trustee from

AXA Equitable and the Debtors, Debtors paid $1,000 in premiums on policy no. 37217988 on

March 28, 2007, and $1,000 on policy no. 44236856 on the same date, immediately prior to the

petition herein. (Objections, at 13).[12]

While this information indicates that Debtors did in fact--contrary to their answer to question

no. 3(a) in the statement of affairs--make payments of more than $600 to a single creditor within

ninety days preceding the petition, the trustee has not shown that Debtors omitted these payments

---

[11]    Question no. 3(a) of the Statement of Financial Affairs reads, in pertinent part, as follows:
"a. *Individual or joint debtor(s) with primarily consumer debts.* List all payments on loans, installment purchases of
goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of
this case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $600. ..."

[12]    According to the trustee's exhibits, Debtors may also have paid an additional $1,000 on each of
these two policies prior to March 28, 2007 and within the 90-day period preceding the petition. *See* Objections,
Exhibit E. The trustee further states that $2,200 in premiums was paid on policy no. 48229682 on April 10, 2007--
but that was postpetition and therefore not within the referenced 90-day period. Although Debtors appear to have
paid additional amounts on this policy in 2007 at some point prior to April 10, the record does not definitively
establish that such amounts were paid prepetition, i.e., prior to April 2, 2007. As for the Northwestern Mutual
policy, no. 13-080-577, the trustee's exhibits merely show an annualized premium of $14,141.04; they do not reveal
dates or amounts of actual payments.

from their answer to question no. 3(a) with any culpable intent. And as to the income figures that Debtors failed to include on their original statement of affairs, the court notes that those figures were promptly added in the first amendment to Debtors' statement of affairs, filed on April 16, 2007, just two weeks after the petition. According to statements made by the trustee in his reply, that was prior to the commencement of the trustee's investigation.[13]

While a court may infer fraudulent or otherwise culpable intent from surrounding circumstances presented in the record, the trustee has failed to establish circumstances sufficient to warrant an inference of bad faith in this case. The trustee urges that Debtors' Second Amended Schedule B- - which, as indicated above, disclosed the policy numbers and the names of the issuers, insureds, and beneficiaries under each policy, including the three now claimed as exempt- - was filed only after the prompting of the trustee as a result of his investigations. Again, however, while that schedule may have been filed after the trustee's "promptings," the record does not support an inference that Debtors would otherwise have failed to file it or that they were practicing any form of deception or intentionally withholding information concerning their ownership of insurance interests.[14] Indeed, if Debtors were attempting to conceal ownership of such interests, they would not have invited investigation by reporting in their original schedules that they held over $415,000 in interests in insurance policies. Based on all the circumstances presented, the court finds that the

---

[13]    The trustee states in his Objections that the "Debtors subsequently amended their Statement of Financial Affairs an additional three (3) times, on April 16, 2007, May 4, 2007, and July 2, 2007— *and in the last two respects only after the Trustee's investigations had commenced.*" (Objections, at 10; emphasis added). Accordingly, the trustee acknowledges that only the May 4 and July 2 amendments were made after his investigations began.

[14]    Nor does Debtors' failure to include in their schedules two additional AXA Equitable Life policies give rise to such an inference--either alone or in combination with all the other facts and circumstances presented here. According to an exhibit attached to the trustee's Objections, these policies, which were in an irrevocable trust, appear to have had de minimus cash value and could easily have been overlooked in the preparation of schedules.

trustee has failed to make a showing of bad faith by clear and convincing evidence.[15]

As for prejudice, the trustee relies on *Talmo's* statements that prejudice may be established by showing that the timing of the amendment caused harm to the litigating postures of the parties in interest. *Talmo*, 185 B.R. at 645. Again, however, utterly unlike *Talmo* and other decisions finding prejudice, the trustee here does not show any change in or harm to the parties' litigation postures resulting from the timing of Debtors' amendment. Again, in determining whether an amendment to the debtor's exemption claim causes prejudice, "the appropriate inquiry is not whether ... creditor[s] will recover less," but whether a party--having changed its position in reliance on the original exemption claim--would be adversely affected by an amendment thereto. 9 L. King, *Collier on Bankruptcy* ¶1009.02[1] (15th ed. rev. 2007). In *Talmo*, for example, creditors would have been prejudiced by the amendment because it would deprive them of the equity created in one of the debtor's mortgaged parcels through sale of another parcel securing the same debt. It was not, however, the mere fact that creditors would be paid less; it was "rather ... a function of the manner in which the property *could* have been applied had the exemption been claimed earlier." *Id.* at 646 (emphasis added).

Here, the only change in position identified by the trustee relates to the fees and expenses that he incurred in investigating and preparing his Objections, his motion for Rule 2004 examinations, and his issuance of subpoenas, *inter alia*, to the insurance companies identified by Debtors in their Original Schedule C. The trustee complains that Debtors' failure to fully and accurately disclose their property interests and their "repeated incorrect and incomplete disclosures"

---

[15]     The Court expresses no opinion, however, as to issues that might yet be presented and addressed in the context of a complaint under §727 of the Bankruptcy Code.

caused unnecessary fees and expenses to be incurred and hampered the trustee's investigation and his diligent administration of the estate. He also complains that Debtors' initial claim of exemptions under 215 ILCS 5/238 caused him to devote time and resources that he otherwise would not have spent had they originally claimed under 735 ILCS 5/12-1001(f), which, unlike § 5/238, does not limit protection to debts of the insured and contains no exception for premiums paid in fraud of creditors.

Again, the Debtors' Second Amended Schedule B, which disclosed the policy numbers and the names of the issuers, insureds, and beneficiaries under Debtors' policies, including the three now claimed as exempt, was filed on July 16, 2007. Accordingly, the trustee had much of the necessary information concerning Debtors' insurance policies more than three weeks prior to the filing of his Objections and more than two weeks before he filed his motion for Rule 2004 examinations. While the Rule 2004 examinations may still have been required, and while he may have incurred additional fees for investigation and research because of the delayed disclosure of the information and the delayed claim under a different exemption statute, the circumstances presented do not establish prejudice warranting a denial of the amended exemption claim. Indeed, the trustee's reasonable fees and expenses for such services appear to be more than amply covered by the cash surrender value available to the estate that exceeds the amounts claimed by Debtors in their amended exemption schedule. In sum, the trustee has failed to establish by clear and convincing evidence that Amended Schedule C should be stricken or otherwise "bar[red] ... from having any effect."

As indicated above, the trustee sought similar relief under the doctrines of equitable and/or judicial estoppel. With respect to equitable estoppel, he states that the doctrine "'has three elements: (1) misrepresentation, (2) reasonable reliance on that misrepresentation, and (3) detriment.'" (Reply,

at 8 (quoting from *Federal Deposit Ins. Corp. v. Rayman*, 117 F.3d 994, 1000 (7th Cir. 1997)).

According to the trustee, the Debtors "knowingly made many material false statements and omissions in the Original and Amended Schedules," and the trustee "relied on their Original and First Amended Schedule B ... to investigate" the Debtors' insurance interests listed on those schedules, including the issuance of subpoenas to the purported issuing companies. (Reply, at 8-9). As for "detriment," the trustee asserts the same forms of prejudice that he asserted in connection with the "Judicial Exception" doctrine discussed above, including the fees and expenses that he incurred in investigating and preparing his Objections, his motion for Rule 2004 examinations, and his issuance of subpoenas to the insurance companies identified in Debtors' schedules.

With respect to the reasonableness of the trustee's reliance on Debtors' "Original and First Amended Schedule B," the court again notes that Debtors provided additional detail concerning their insurance interests in their Second Amended Schedule B, filed weeks before the trustee filed his Objections to Debtors' amended exemptions. Moreover, the trustee's showing of "detriment" fails for the same reasons that his showing of "prejudice" was insufficient to warrant the striking of the amended exemption claim under the Judicial Exception doctrine, discussed above. Indeed, the trustee himself states that "[e]stoppel and the Judicial Exception are coterminous on the subjects of 'detriment' and 'prejudice' ..." (Reply, at 7 n. 5). Application of the doctrine in this case would be inequitable--particularly in light of the fact that the trustee's reasonable fees and expenses appear to be more than amply covered by the cash surrender value available to the estate.

Finally, the judicial estoppel doctrine has no application to the facts presented here. The judicial estoppel doctrine is equitable in nature, and its purpose is to protect the integrity of the judicial process by "prohibiting parties from deliberately changing positions according to the

-27-

exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149

L.Ed.2d 968 (2001) (quoting from *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). The

Supreme Court explained in *New Hampshire* that although the circumstances under which the

doctrine may be invoked are "probably not reducible to any general formulation of principle,"

several factors "typically inform the decision." *Id.* at 750 (internal quotation marks and citations

omitted). First, the later position must be "clearly inconsistent" with the earlier position. *Id.* (citing,

*inter alia*, *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)). Second, courts inquire whether

the party to be estopped succeeded in persuading the first court to accept its earlier position, "so that

judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that

either the first or the second court was misled'" (thereby posing a threat to judicial integrity). *Id.*

at 750-51 (quoting from *Edwards*, 690 F.2d at 599). The third factor is whether the party asserting

an inconsistent position would gain an unfair advantage or impose an unfair detriment on the other

party if not estopped. *Id.* at 751 (citations omitted); *see also Jarrard v. CDI Telecommunications,

Inc.*, 408 F.3d 905 (7th Cir. 2005) (discussing similar factors, as well as "whether the operative facts

remain the same in both cases"). *Id.* at 914-15.

In this case, the Debtors never "succeeded in persuading [this] court to accept" a position

with respect to their Original Schedule C. Accordingly, there is no risk of an inconsistent

determination in "a later proceeding." Indeed, there is no "later proceeding" here; all that the

Debtors have done is to amend their exemption schedule. The fact that they made changes to that

schedule--including a change in the statute under which they claim--does not constitute a "clearly

inconsistent position" posing a threat to the integrity of the judicial process.

Having concluded, for all of these reasons, that Debtors' Amended Schedule C should not

be stricken, the court will now address the trustee's substantive objections thereto. As indicated above, the trustee asserted that even if Debtors' Amended Schedule C were not stricken, the exemptions claimed in that schedule would fail based on the same objections made by the trustee to Debtors' Original Schedule C. Of those five objections, however, three are clearly inapplicable to the amended exemption claim. First, the trustee's objection with respect to policies that name a beneficiary who is not within the statute's enumerated beneficiary class has effectively been resolved. The trustee asserted this objection with respect to AXA Equitable policy no. 37238527 (as to the 75% beneficiary interest of Debtors' son and the 25% interest of Debtors' grandson) and with respect to AXA Equitable policy no. 48229682 (as to the 50% beneficiary interest of Debtors' son). In Amended Schedule C, Debtors have eliminated AXA Equitable policy no. 37238527 as well as 50% of the cash surrender value of AXA Equitable policy no. 48229682.

The other two objections that no longer apply are those relating to premiums paid in fraud of creditors and to policies naming one of the Debtors as beneficiary (which would subject policy value to the beneficiary's debts). Again, Debtors' change in exemption statute from 215 ILCS 5/238 to 735 ILCS 5/12-1001(f) had the effect of vitiating these objections, because the latter provision contains no exception for premiums paid in fraud of creditors and no limitation of its protection to the debts of the insured.

The trustee is therefore left with his specificity objection and the "statutory language" objection discussed in the supplement to his reply. As indicated above, the specificity objection fails, as the Debtors have now provided--in both their Second Amended Schedule B and their Amended Schedule C--not only policy numbers, but also the names of the insured and beneficiaries under each policy claimed as exempt, as well as the familial relationship of the beneficiaries to the

-29-

insured. In his reply, the trustee noted that Debtors, in filing their Second Amended Schedule B, still failed to provide any premium payment information and information as to the dependent or independent status of non-spousal beneficiaries. However, even assuming that premium information would have been required had the Debtors not amended their exemption claim, the change in exemption statute to § 12-1001(f) renders such premium payment information irrelevant, as that provision contains no exception for premiums paid in fraud of creditors. Likewise, the dependent or independent status of non-spousal beneficiaries has been rendered irrelevant by the amendment, as Debtors now only claim the exemption where the beneficiary is the insured's spouse.

The statutory language objection that was the subject of the trustee's supplement is his contention that the cash surrender value is not exemptible when it is payable to the insured. The trustee notes that under both § 5/238 and § 12-1001(f), the exemption applies to "proceeds payable because of the death of the insured and the aggregate net cash value of any or all life and endowment policies and annuity contracts payable to a wife or husband of the insured, or to a child, parent or other person dependent upon the insured." The trustee argues that in order to be exemptible, the cash surrender value "[t]herefore ... must be payable to *someone other than the insured*, who falls within one of the enumerated *dependent classes*." (Supplement, at 1-2; emphasis in original). In two of the three policies claimed as exempt in Amended Schedule C, the cash value is payable to an individual who is both the owner and the insured under the policy. Thus, urges the trustee, the cash value, being payable to the insured, cannot perforce be payable to a spouse or dependent of the insured.

The trustee is necessarily contending that the phrase "payable to a wife or husband of the insured, or to a child, parent or other person dependent upon the insured" modifies the distant phrase

-30-

"aggregate net cash value," rather than the phrase which immediately precedes it, i.e., "life and endowment policies and annuity contracts." He thus urges that the reference to the insured's spouse and his/her child, parent, or other dependent constitutes a list of the cash value payees that will render a policy exempt, as opposed to a designation of the beneficiaries that will confer such status.

Not surprisingly, the trustee fails to cite any caselaw in support of this innovative contention. Indeed, the decisions that address this statutory language appear to assume without discussion that the phrase "wife or husband of the insured, or ... child, parent or other person dependent upon the insured" refers to the class of beneficiaries that will render a policy exempt. *See, e.g., In re Schriar*, 284 F.2d 471 (7th Cir. 1960); *In re Grace*, 273 B.R. 570 (Bankr. S.D.Ill. 2002); *In re Sommer*, 228 B.R. 674 (Bankr. C.D.Ill. 1998); *see also In re Ellis*, 274 B.R. 782, 784 n.1 (Bankr. S.D.Ill. 2002).

In *Schriar*, the debtor claimed as exempt three insurance policies on his life which named as beneficiaries his three adult children. The trustee sought an order directing the debtor to turn over the policies because none of the beneficiaries was dependent upon the debtor for support. The referee entered an order directing that the cash surrender value be turned over to the trustee, and the district court affirmed. *Schriar*, 284 F.2d at 471-72. On appeal to the Seventh Circuit, the Court articulated the question before it as follows: "[W]hether or not the Illinois Insurance Exemption Statute covers the cash surrender value of life insurance policies payable to nondependent adult children of a bankrupt-insured, so as to protect the cash value of such policies against the claim of a trustee in bankruptcy." *Id.* at 472.[16] The Court affirmed the decision, finding that no exemption is available where policies are payable to adult, nondependent children of the insured. In its discussion, the Court never analyzed who, under the policy, was entitled to be paid the cash

---

[16]    The statute at issue was §5/238, though codified at the time at Ill.Rev.Stat. ch. 73 §850.

surrender value and whether they were "dependent upon the insured" within the meaning of the statute.[17] Clearly, the Court understood the list of individuals in the statute to be a designation of the beneficiaries that will render a policy exempt, and not a list of permitted cash value payees. Indeed, the Court specifically stated: "The instant statute limits the *beneficiaries* 'to a wife or husband of the insured, or to a child, parent or other person dependent upon the insured.'" *Id.* at 474 (emphasis added).

In *In re Ashley*, 317 B.R. 352 (Bankr. C.D.Ill. 2004), where a debtor sought to exempt the "proceeds" of a policy on the life of her deceased husband, the court discussed the history of the exemption provisions. It noted that when the exemption of § 5/238 was enacted in 1937, it carried forward the exemption of an earlier statute for the "proceeds" of a life insurance policy[18] and "extended its protection to the *insured's* interest in the cash value of an insurance policy payable to a spouse, a child, a parent or other person dependent upon the insured." *Id.* at 356 (emphasis added).[19] Thus, contrary to the trustee's contention in this case that a policy's cash value is only exemptible if "payable to someone other than the insured" (i.e., to the insured's spouse or his/her child, parent or other dependent), the *Ashley* court clearly understood that "payable" modifies "policy" and that the listed individuals are therefore those to whom the "policy" must be payable (*viz.*, the beneficiaries) in order for the policy to be exempt.

---

[17]    Of course, the cash surrender value would have been payable to the debtor/insured; otherwise, there would have been no need to determine whether his interest therein was exempt.

[18]    The term "proceeds" refers to "'[t]he fund ... which is created with and after the act of death ...'" *In re Ashley*, 317 B.R. at 356 (quoting from *Vieth v. Chicago Title & Trust Co.*, 307 Ill.App. 99, 30 N.E.2d 126, 130 (1940).

[19]    The court notes that while cash surrender value is often payable to the owner/insured, it may also be payable to other parties, including an owner/beneficiary. *See, e.g., In re DeRosear*, 259 B.R. 320 (Bankr. C.D.Ill. 2001).

Finally, in *Dowling v. Chicago Options Assoc., Inc.*, 365 Ill.App.3d 341, 847 N.E.2d 741

(2006), where a policy was held not exempt because it named a trust as beneficiary, the court stated:

> The plain language of section 12-1001 makes clear that the aggregate net cash
> value of a life insurance policy will be exempt ... so long as the policy *proceeds*
> are payable to the insured's spouse or dependents. ...
> ... [T]he legislature stated that, in order for a debtor's life insurance policy to
> qualify as exempt, all proceeds of the debtor's life insurance policy shall be pay-
> able to "a wife or husband of the insured, or to a child, parent, or other person
> dependent on the insured." 735 ILCS 5/12-1001(f) (West 2002). The legislature
> did not include nonperson entities, such as trusts, in its *list of beneficiaries that
> would enable a debtor's life insurance policy to be given exempt status.*

*Id.* at 748-49.

In this case, the trustee himself--in the context of other objections to Debtors' insurance

policy exemptions--refers to the individuals listed in the statute as the "enumerated beneficiary

class" that will render a policy exempt (*see, e.g.*, Objections, at 14; Reply, at 3), thereby belying his

purported belief that they comprise a designation of cash surrender value payees.

In sum, the trustee's statutory language objection will also be denied.

## CONCLUSION

For all of the reasons set forth above, the court denies the trustee's request to strike Debtors' Amended Schedule C and to bar it from having any effect and overrules the trustee's objections to Debtors' claimed exemptions in insurance policies.  This opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.  A separate order will be entered pursuant to Bankruptcy Rule 9021.

Dated:  **APR 3 0 2008**

ENTER:

Susan Pierson Sonderby
United States Bankruptcy Judge

-34-